Tracy Ray SCHMIDT, Plaintiff,

v.

Bob ODELL, individually and as Sheriff of Cowley County; the Board of County Commissioners of Cowley County, Kansas; Bill Munley, individually and as Head Jailer of the Cowley County Jail; and Craig King, Individually and as Undersheriff of Cowley County, Kansas, Defendants.

No. 97–1367–WEB.

United States District Court, D. Kansas.

July 7, 1999.

Kenneth G. Gale, Adams & Jones, Chartered, Wichita, KS, for Plaintiff.

Van M. Halley, Morrison & Hecker L.L.P., Alan L. Rupe, Georgina R. Adami, Husch & Eppenberger, Wichita, KS, for Defendants.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

The plaintiff was formerly an inmate at the Cowley County Jail. He is a double amputee and is without both legs from a point below his knees. He alleges that during his incarceration the defendants deprived him of a wheelchair or other accommodation and forced him to crawl and pull himself about the jail on the floor. He asserts claims under the Eighth Amendment, the Americans with Disabilities Act, and the Rehabilitation Act of 1973. He also asserts a state law tort claim for intentional infliction of emotional distress. The matter is now before the court on the defendants' motion for summary judgment. The court finds oral argument would not assist in deciding the issues presented.

### I. Facts.

In keeping with the standards governing summary judgment, the following facts are either uncontroverted or are stated in the light most favorable to the plaintiff. Facts in the parties' briefs not supported by the record, not based on the personal knowledge of the witness, or that are clearly immaterial have been deleted from the following statements.

### A. Defendant's Statement.

Plaintiff was incarcerated in the Cowley County Jail from February 14, 1995, after being convicted of driving under the influence of alcohol and driving on a suspended license.

Plaintiff is a double amputee and is without both legs from a point below his knees. Plaintiff's legs were amputated after he contracted frostbite in 1979 while on the run from the Atchison Youth Center, where he had been incarcerated.

Plaintiff was admitted to the Cowley County Jail in February of 1995 with prosthetic devices and was never prevented from using these devices to ambulate throughout the jail. Plaintiff did not wear his prostheses while showering, however, since they would have been damaged by the water. Plaintiff requested a shower chair from the beginning of his incarceration. In September of 1995, after the physician who treated inmates asked for it, the jail staff provided plaintiff with a shower chair so that he would not have to place his unprotected residual legs directly on the shower floor.

The prosthetic legs plaintiff had been using during his 1995 incarceration at the Cowley County Jail were damaged when plaintiff was in a fight with another inmate

who plaintiff alleges had stolen his food. As a result of the fight, a piece of wood was broken off from the right foot of plaintiff's prosthesis. According to plaintiff, this damage made it difficult for him to control the device. Consequently, plaintiff had difficulty walking and it became painful for him to wear the prosthesis. This incident was not reported to jail staff.

Prior to his incarceration in 1995, plaintiff had been taking Lortab, Lortab 7, Tylenol 3, Demerol and morphine because of the pain he had been experiencing in his residual legs. Plaintiff ultimately developed a dependency on these medications and continued to use them throughout his 1995 incarceration in the Cowley County Jail. In addition, plaintiff used illegal drugs including marijuana and methamphetamines during his 1995 incarceration at the Cowley County Jail.

During the first few months of plaintiff's 1995 incarceration at the jail, jail officials permitted plaintiff to be taken to his private physicians by family and friends. In April of 1995, plaintiff tested positive for cocaine and was no longer given this privilege. Thereafter, jail staff transported plaintiff to Sabolich clinic in Wichita to be fitted for new prostheses; he was no longer allowed to be taken out of the jail by anyone other than jail personnel.

Plaintiff's appointments at the Sabolich clinic typically lasted up to three hours.

In addition to appointments at the Sabolich clinic, plaintiff was treated by the jail physician, Dr. Alvin Bird. Bird had treated plaintiff on a previous occasion when plaintiff had been incarcerated at the Cowley County Jail, including a period in 1980. Head Jailer Bill Munley scheduled doctor's appointments with Dr. Bird for plaintiff when he requested treatment.

While treating plaintiff in 1995, Dr. Bird observed that plaintiff's residual legs had not suffered any tissue breakdown or irreversible harm during his 1995 incarceration. In addition, Dr. Bird testified in this action that plaintiff's condition during his 1995 incarceration was better than it had been during prior incarcerations and noted

that in 1980 plaintiff had experienced swelling or edema on his knees.

Dr. Bird did not note any severe hygiene problems associated with the kneepads plaintiff had been wearing in 1995 and did not observe any bacterial infection on plaintiff's knees or legs during that time period. He did observe that plaintiff had folliculitis (inflammation of hair follicles) on August 16, 1995, which he treated with Tetracycline and Ultram to prevent it from becoming a cellulitis, a "worrisome infection."

Dr. Bird's opinion is that the conditions of the Cowley County Jail in 1995 did not play a part in what he termed the "chronic irritation of plaintiff's knees." Bird based this conclusion on his comparison of plaintiff's condition in 1995 to his condition during prior incarcerations.

Dr. Bird's opinion is that the Cowley County Jail provided adequate care for plaintiff's medical needs in 1995. He felt like "we were doing all we could do under the circumstances."

On April 10, 1995, plaintiff suffered a fall at the Sabolich clinic in Wichita. As a result of the fall, plaintiff's residual legs were badly bruised and he suffered a great deal of pain and swelling in his residual legs. After the fall, plaintiff became physically unable to wear his prostheses.

As a result of swelling in his residual legs, the Sabolich technicians could not fit plaintiff with a permanent set of prostheses. Plaintiff still had a temporary pair of prostheses, but after he fell it was too painful for him to walk in them.

Since plaintiff claimed he could no longer walk using his prostheses, Sabolich requested that the Cowley County jail officials place plaintiff in a wheelchair. Although jail officials gave due consideration to this request, they were unable to make this accommodation because the exits, entrances and hallways of the jail were too narrow for a wheelchair to pass through. In addition, jail administrators were concerned that a wheelchair could

be used to conceal contraband or be dismantled so that the parts could be used as weapons. Therefore, without his prostheses, plaintiff ambulated through the jail on his knees.

Since plaintiff could not use a wheelchair, Head Jailer Bill Munley supplied plaintiff with kneepads to reduce the risk of further damage to his residual legs. On one occasion, Munley ran into plaintiff's mother at a Wal–Mart store and she assisted him in locating kneepads that would be best suited for plaintiff. During plaintiff's 1995 incarceration, Munley spent as long as three hours in one day looking for kneepads for plaintiff. Munley purchased numerous pairs of kneepads for plaintiff during his incarceration and would always supply him with a replacement pair of kneepads when plaintiff requested one.

In addition to providing plaintiff with kneepads, jail officials offered to house plaintiff in cellblock 9, which had urethane floors that are softer and smoother than the concrete floors in the other cells. Jail officials also offered to house plaintiff in cellblock 11, which has a shower and toilet right by the bunk. The close proximity to these facilities would have significantly limited the need for plaintiff to ambulate. Sheriff Odell also offered to put mattresses on the floor of cellblock 11 to further accommodate plaintiff's needs. The jail housed other inmates in cellblock 11 for long periods, but plaintiff refused to be housed in either cellblock 9 or 11.

Sheriff Odell met with Cowley County District Court Judge Bishop on four to five occasions to discuss relocating plaintiff to a facility that could accommodate an inmate in a wheelchair. Odell was told that a transfer could not be accomplished without authorization from plaintiff's attorney. A transfer to any of the state penitentiaries was impossible since plaintiff was not being held on state charges.

Randall Frazee, a double amputee who had been incarcerated at the Cowley County Jail, was acquainted with plaintiff. According to jail officials, Mr. Frazee occasionally ambulated in the jail on his hands and knees and did not complain about the conditions in the jail more than the other inmates.

The Kansas Department of Corrections has issued Kansas Advisory Jail Standards and Procedures. The standards are rated as "urgent," "necessary" or "desirable." Urgent standards are defined as "standards regarding conditions or procedures, which effect [sic] the life, health, safety and security of inmates and the general public. Urgent rated standards should receive priority compliance." Approximately 15–27% of the standards are rated urgent (depending on how many standards are counted).[1] A large majority of the standards—approximately 80%—are rated as "necessary." Approximately 8% are rated desirable.

A 1995 Jail Inspection Report reflecting an October 13, 1995 inspection shows that the jail was in compliance with all "urgent" standards on that date. Overall, the jail was found to be in compliance with 129 out of 190 applicable standards, or 68%.

The Kansas Advisory Jail Standards define "capacity" as "the number of persons a facility has been constructed to house under full, normal operation, without the addition of extra beds."

Sheriff Odell testified that he believed the original number of beds in the facility as constructed was over 70, although the jail now has 61.

In the 1995 inspection report, the inspector stated that the recommended capacity of the Cowley County Jail was 39 inmates with access to dayrooms and walkways, and 24 inmates without such access. (This determination apparently reflected

---

1. There is some dispute between the parties as to the precise number of existing standards and the number of standards examined in the October 13, 1995, inspection. The numbers used by the court are approximates based upon the documents presented. The court concludes that any dispute as to the exact number of standards is not material to any of the issues presented.

the space requirements in the Kansas Advisory Jail Standards.) The inspector found that the jail was "continually over population recommendation."

The Cowley County Jail housed 61 or fewer inmates in 258 days (70%) during 1995. The average population was 58.1.

The cells in the Cowley County Jail provided approximately 20 to 40 square feet per occupant.

The Kansas Advisory Jail Standards state that cells with a capacity of two or less should provide at least 60 square feet of floor space per inmate when immediate access to a dayroom is provided, and 70 square feet when access to a dayroom is not provided.

Most of the cells at the jail have access to an adjacent formal day area or an informal hallway area. Inmates are rarely confined to their cells and are given opportunities to mingle with others or to have privacy in their cells. The dayrooms offer space for informal recreational activities and inmates who wish to are able to exercise in there. Dayrooms are not encumbered by overflow bunks and beds.

There is no outdoor exercise for the inmates. An inmate in cell block 4, one of the main felony tanks, was limited to walking around inside the cell block, in the dayroom and sleeping area, for exercise. The facility received an "unsatisfactory" rating for "Inmate Exercise Area" in the 1995 inspection.

Inmates at the jail generally had daily access to a shower. Continuous access toilets and running water were provided. Inmates had daily access to cleaning supplies for their cells and dayrooms and were able to paint these areas on request. Inmates were primarily responsible for maintaining sanitation and hygiene and were provided with the necessary items and supplies. It is typical practice in Kansas jails to employ inmate labor to clean the facilities.

At the time of the October 1995 inspection, the jail did not have a policy to ensure that clean bedding was issued. The practice was leave the bedding exchange process up to the inmate, with exchanges being made up to twice a week.

The inspector noted in his report that there was a problem with ventilation and he observed that the humidity felt high.

In 1995 the Cowley County Jail had nine primary housing units providing 20 cells for inmate housing. Short-term segregation was available in two single-occupancy holding cells (# 9 and # 10). Two large housing units each had room to hold 14 inmates.

Cowley County Jail inmates received appropriate food service in 1995.

Jail staff facilitated scheduled visits for inmates' family and friends. Visits were allowed in the housing area, through the glass in the cell doors. Jail personnel "bent the rules" regarding visitation to accommodate plaintiff by opening up the food tray slot in the visitation door so that he could talk to his daughter. It was against the rules of the jail to have that slot open during visitation.

Inmates had daily access to commissary items. Telephones were provided for unlimited inmate use in every housing unit. Telephone access was occasionally curtailed for brief periods in response to inmate behavior or incidents, but overall inmates had continuous access to phones during all waking hours.

Jailers occasionally made popcorn for the inmates as a snack and in the warmer months brought ice to the cell areas.

Inmates are allowed to smoke in the jail as an effort to avoid the stress that a smoking ban would cause. Many jails have banned smoking, and the Cowley County staff have frequently asked that smoking be banned in the jail. Smoking makes it more difficult to maintain the facility and poses some additional safety exposure. But Sheriff Odell has decided that overall, allowing inmates to smoke will result in less stress for the inmates.

Various repair persons were promptly brought to the jail to repair equipment and systems (electricians, plumbers, washing machine repair, ice machine repair, telephone repair, county maintenance personnel).

Inmates spoke to staff frequently about their needs and the needs of other inmates. Staff responded to inmate requests. Staff were also contacted several times by inmates' families.

The jail daily logs reflect some of the staff's efforts to meet the needs of inmates.

B. *Plaintiff's Statement.*

The Cowley County Jail was built in the early 1960's. When the plaintiff was incarcerated there in 1995, it was overcrowded, unairconditioned, and, despite treatment, it had chronic problems with cockroaches. The plumbing sometimes overflowed, leaving the floors wet and dirty.

When the jail received a sentenced prisoner and had no room, the jail would give the prisoner another date to come in and begin the sentence. If the jail was overcrowded, prisoners would sometimes be transferred to other counties.

There were three types of cells at issue in this case. The first type is cell blocks 4 and 7. These are the main felony tanks. They each have two rooms. One is a "dayroom" which contains tables and chairs, a television, shower and toilets. This area (362 sq. ft. in cell block 4; 242 sq. ft. in cell block 7) is where the inmates eat and spend their day. There is a window on one wall of the dayroom where food is passed to the inmates. The second room contains fourteen or sixteen bunks, stacked in pairs, and another toilet. This area (296 sq. ft. in block 4; 300 sq. ft. in block 7) is where the inmates sleep. A narrow door, which can be closed and locked down, separates the dayroom from the sleeping area. The floors are concrete. The concrete was cracking in places, particularly around the showers and toilets where there was water.

The second type of cell is "detox," also called the "drunk tank" or the "hole." These are designated blocks 9 and 10. These are single cells, 57 sq. ft. in size, completely enclosed except for one one-foot square window, and an 8–by–11 inch feeding slot in the door. Each has a toilet/sink combination, which can only be flushed from the outside. There is no furniture. There is a concrete floor with an 8 to 12–inch raised portion for a bed. The floor is covered in polyurethane and there is a mattress on the raised portion.

The third type of cell is in block 11. These are two two-person cells, 45 sq. ft. each with one pair of stacked bunks each. Inside each cell is a shower, toilet and lavatory. These were used for normal jail holding, though they would be filled last. The jailers tried to keep these open for segregation purposes. The floors are concrete.

The plaintiff began his confinement at Cowley County Jail on February 14, 1995. Before his incarceration, on February 7, he had an appointment with Dr. Brenda Taylor Schewe for infections on his stumps. She found that his stumps were "clearing up nicely."

On February 20, 1995, plaintiff's mother picked him up at the jail for an appointment with his physician, Dr. Old. Dr. Old treated the plaintiff for cellulitis on his stumps and gave the plaintiff a copy of a letter he had written the jail on a previous occasion in 1993 requesting a wheelchair-accessible shower or a shower chair for the plaintiff. The plaintiff requested a shower chair throughout his incarceration in 1995. He was denied that request until the chair was eventually provided in September. Sometimes he used kneepads in the shower, which were provided by the jailers. The plaintiff told the jailers that the kneepads did not adequately protect his stumps.

Prior to the time he got the shower chair, it was difficult and painful for plaintiff to take a shower. He had to crawl to the shower, and showering required him to

put weight on one knee or to stand on his knees at various times and this was painful. He sometimes slipped and would land on his knees.

Between February 26 and March 23, the plaintiff was taken to physician's appointments several times by family members. During this period, plaintiff was being fitted for new artificial legs by medical technicians Ed Gormanson and Susan Bailey of Sabolich Prosthetic Center of Wichita.

On March 21 and 23 the plaintiff was examined by Dr. Brenda Taylor Schewe. She found that the infections on the plaintiff's stumps were much improved. She noted a boil on the left posterior stump.

On March 28, 1995, Susan Bailey of Sabolich wrote a note to the jail stating: "Do not recommend activities on his knees which can create pressure problems for when he drops them off. Wheelchair will be needed." The head jailer received this note and told the sheriff about it. On April 9, plaintiff was told that he tested positive for cocaine and thereafter he was not allowed to be transported to the clinic by family members.

On April 10, the plaintiff was taken to his appointment at Sabolich in Wichita. While at this appointment, the plaintiff fell in the restroom and landed on his residual legs. He was taken to the emergency room in Winfield. Thereafter, he had difficulty wearing his prostheses because it was too painful to walk in them. Ms. Bailey of Sabolich wrote another note to the jail that day stating that the plaintiff needed to stay off of his residual limbs until he is refitted for his prostheses. The head jailer received this note and spoke to Ms. Bailey about the request, telling her that he was not in a position to get the plaintiff a wheelchair. He passed the request on to the sheriff.

The jailers did not allow plaintiff a wheelchair because they claimed the entrances and exits to the cells are too narrow, the chair could be used to block the cell block, the other inmates would play with the wheelchair, the wheelchair could be used to hide contraband, and the wheel-chair could be disassembled and made into a weapon. There are no written security standards from any government agency or association of any kind concerning the safety risks of wheelchairs in a jail. The jail has never had any written guidelines on dealing with a prisoner in a wheelchair.

The plaintiff was taken to appointments at Sabolich in Wichita several times between April 10 and May 26. The jailers transporting the plaintiff refused to allow the plaintiff the use of a wheelchair. There was a wheelchair available at the jail but the plaintiff was refused its use, being forced to crawl into the jail parking lot and into the van, and then to crawl through the parking lot in Wichita at Sabolich, into the elevator, and up to his appointment. The guards also denied his request to acquire a wheelchair at the medical facility for the plaintiff. The crawl through the parking lot was both painful and humiliating.

On April 13, Mr. Gormanson at Sabolich reported that plaintiff was in for final adjustments. Gormanson noted that the plaintiff was having discomfort using the limbs and that further adjustments were required. On April 24, Gormanson noted swelling and sensitivity, and instructed the plaintiff to return in a week and a half. On May 5, Gormanson measured swelling and fluid in the limbs. This prevented fitting.

At the May 11 visit, Gormanson noted that he was unable to fit the new prostheses because of swelling. He wrote a letter to the jail stating that the plaintiff needed to not walk on his knees at all, and that he required a wheelchair with leg rests. The head jailer received this letter and passed it along to the sheriff.

The plaintiff had several discussions with jailers about getting a wheelchair. He was told by Sergeant Munley that Sheriff Odell said that the jail was not accessible for a wheelchair and if the plaintiff continued to bring up the issue he would serve his time in the "hole" (the detox cell).

At the May 24 appointment, swelling problems continued to prevent fitting at Sabolich. The same problem occurred on May 26, with the addition of hair follicle infections. Gormanson wrote the jail a note that the infections needed to be lanced. The technicians at Sabolich gave up trying to fit the devices because of swelling. (Schmidt depo., Tab A, Vol.11, pages 157–158; Sabolich Medical Records, Tab U.)

On May 31, the plaintiff was seen by Dr. Gibson, who was filling in for Dr. Bird, the usual physician who treated the inmates. (Bird depo., Tab D, pages 21–22; 37.) Dr. Bird's medical file on the plaintiff is Deposition Exhibit 17. (Bird depo., Tab D, page 18–19; Depo. Ex. 17, Tab N.) Dr. Gibson was unable to drain anything out of the nodule below the plaintiff's right patella. Dr. Gibson told the plaintiff that he would talk to the head jailer about kneepads and a wheelchair. (Bird Medical Records, Depo. Ex. 17, Tab N.) That day, Dr. Gibson called for the head jailer, Sergeant Munley, who was not in, about kneepads and a wheelchair for the plaintiff. On June 1 Dr. Gibson talked to Sergeant Munley and was told that it was impossible to provide the plaintiff a wheelchair, but that they could encourage the plaintiff to stay off of his stumps as much as possible and could get new kneepads. (Munley depo., Tab B, pages 207–208; Bird Medical Records, Depo. Ex. 17, Tab N.)

On June 9, the plaintiff had his infection lanced by Dr. Samuel, who put stitches in his leg. On June 19, after removing the stitches, Dr. Samuel wrote a prescription to the plaintiff requiring a wheelchair for four months. This was delivered to the jailers. (Depo. Lx. 10, Tab L, produced with the defendants' initial disclosures; Hearing Transcript, Tab F, page 14.) This surgical procedure and the stitches also prevented the plaintiff from being able to tolerate his prostheses. At this time it was very painful for the plaintiff to get in and out of the shower and to crawl about. (Schmidt depo., Tab A, Vol.11, pages 193–94, 242, 254–256.) He testified that "emotionally and mentally I had just

pretty well lost it." (Schmidt depo., Tab A, Vol.11, page 242.) When he returned from getting the stitches in his stump, Sergeant Munley yelled at him to get on his bunk and not get off of it. The plaintiff challenged the jailer to carry him to the toilet and shower and bring him his food, which he never did.

The head jailer testified that if he had stitches in a foot he would do everything in his power to keep off of the floor, because of the difficulty keeping the floors clean in the jail. (Munley depo., Tab B, pages 201–202.) He also recognized that the plaintiff could not stay off of the floor completely. (Munley depo., Tab B, pages 202–203.)

On June 26 the plaintiff appeared before the district court on a motion by the plaintiff's attorney, William C. Weber, to change the disposition of the plaintiff's sentence and to get him probation or home arrest. (Hearing Transcript, Tab F, pages 3, 14–20, 48.) The plaintiff testified to Judge Bishop that he had been having trouble getting his new prosthetic limbs fitted, and explained that he had recent surgery. He explained that he had been unable to use his prostheses in the jail, and was not afforded the use of a wheelchair. He explained the procedure he had to use to take a shower. (Hearing Transcript, Tab F, pages 10–11.) He described the procedure for using the bathroom: "I can lift myself up which you know it's—it's pretty nasty. I can lift myself up between the bars and the toilet and try to either sit on it like that or stand on it with—by pulling myself up with my hand on the bar and the sink that's right above it." (Hearing Transcript, Tab F, page 11). He explained that to get around the jail, he had to "Crawl, walk on my knees and then I'll slide on by butt, walk on my hands and knees to take pressure off my knees." (Hearing Transcript, Tab F, page 11–12.) The plaintiff testified that the medical problems with his knees have made it difficult to get around. He testified that "it's caused a lot of pain in my prostheses, too, as far as walking, but I was—I had been

trying to get a wheelchair, but I was told that if I asked for a wheelchair again by the head jailer that I was going to the hole." (Hearing Transcript, Tab F, page 12.) Sheriff Odell advised the judge at the hearing that the Sedgwick County jail was willing to do a prisoner trade if the plaintiff's attorney inspected and approved the Wichita facility. This offer had been conveyed to another attorney helping the plaintiff, but not to the plaintiff or to the attorney representing the plaintiff at the hearing. The Sheriff said that he would need to contact Sedgwick County again to determine if the offer was still available. (Hearing Transcript, Tab F, pages 40–43.) The plaintiff testified that he was willing to serve his sentence at the Sedgwick County facility. (Hearing Transcript, Tab F, pages 43–44.) The court denied the motion to modify the sentence, ruling that the transfer was more appropriate. (Hearing Transcript, Tab F. page 44.) The plaintiff's attorney expressed discomfort about inspecting the Wichita jail by himself, but the judge refused to allow the plaintiff to accompany him on an inspection. (Hearing Transcript, Tab F, pages 46–47.)

On July 24, Susan Bailey wrote the plaintiff a letter stating: "Understand jail has refused you a wheelchair and you have been forced to walk on your knees. All this has made it impossible to fit your prostheses. We know we can fit you with legs again as soon as your knees have healed from the abuse of walking on them." (Depo. E. 11, Tab J; Sabolich Medical Records Tab U).

On August 7, the plaintiff filled out an "Inmate Request for Medical Attention" form at the jail requesting medical attention. He complained of fluid build up which made his knees ache. He complained of too much pressure on his knees. Sergeant Munley remembers seeing the request. (Munley depo., Tab B, page 152; Depo. Lx. 4, Tab I, page A00464.) On August 9, Sergeant Munley had a telephone conversation with Dr. Bird, the physician who normally treated the inmates, who told Sergeant Munley to have the plaintiff stay off of his knees. Dr. Bird did not examine or treat the plaintiff in response to this request. (Munley depo. Tab B, pages 152–153.) Dr. Bird knew that the plaintiff could not stay off of his knees completely. (Bird depo., Tab D, page 45–46.)

On August 10, the plaintiff's attorney, William C. Weber, died.

On August 14, the plaintiff submitted a Medical Request Form. He wrote "My knees are swollen. I have some kind of brake out [sic] on both stumps. I need new kneepads. And my knees are throbbing with a dull pain a awful lot of the time. Thank you." (Depo. Lx. 4, Tab I, page A00465.) The head jailer saw this request. (Munley depo., Tab B, pages 156–157.) On August 16, Dr. Bird examined the plaintiff in the jail. He found that there was no actual breakdown of tissue at contact points, but that the plaintiff had folliculitis from the heat and contact with the kneepads. Dr. Bird prescribed tetracycline, an antibiotic, for that condition. He also wrote that new kneepads that would hold up better were needed, and that plastic kneepads were needed for the shower. (Bird depo., Tab D, pages 36, 38–39; Bird Medical Records, Depo. Ex. 17, Tab N.) On August 18, the plaintiff was provided with new kneepads by the jail. (Depo. Lx. 2, Tab G, page A00080.)

On August 30, Dr. Bird reexamined the plaintiff. The plaintiff complained that his knees stayed swollen because he had to scoot around on his knees. Dr. Bird recognized that the plaintiff had five more months to go on his sentence. Dr. Bird wrote: "He [the plaintiff] would like to have a different kind of transportation. I will see if we can't get him a wheelchair or something else that he could get around in. It seems like each time we invest in kneepads they don't work. Then he could probably put on his reducers and get his knees down to where he could get back in his prosthetics." (Bird depo., Tab D, pages 42–43; Bird Medical Records, Depo. Lx. 17, Tab N.)

Sometime during the end of August or beginning of September, Dr. Bird and the head jailer had a discussion about the plaintiff. Dr. Bird told the head jailer that the kneepads were not adequate, and they discussed the possibility of getting some other type of transportation for the plaintiff to get around. (Munley depo., Tab B, pages 211–213; Jail Medical Records, Depo. Lx. 9, Tab K, page 31; Bird depo., Tab D, pages 42–43.)

On September 5 the plaintiff submitted a Request for Medical Attention. He wrote to Dr. Bird "My knees hurt. You said I was going to get a wheelchair & I haven't. My butt is peeling like athlete's foot. It may be from the shower." The head jailer saw this request. (Depo. Lx. 4, Tab I, A00468; Munley depo., Tab B, page 157.) On September 9 an article was published in the local newspaper, the Arkansas City Traveler, about the plaintiff's plight in the County jail. (Tab W.)

Dr. Bird saw the plaintiff on September 11. He reported that Sergeant Munley had a fear about the wheelchair being dismantled and used as a weapon. Dr. Bird recommended that the plaintiff be transferred to the Sedgwick County jail. Dr. Bird ordered antifungal cream for the rash on the plaintiff's buttocks. (Bird depo., Tab D, pages 47–49; Bird Medical Records, Bird Medical Records, Depo. Lx. 17, Tab N.)

On September 20 the plaintiff submitted a Request for Medical Attention. He wrote "Knees hurt, fluid in stumps. I'm in pain. And still got rash on my butt." (Depo. Lx. 4, Tab I, page A00469.) By this time, the head jailer knew the plaintiff had been on his knees in the jail for some months. (Munley depo., Tab B, page 162.)

On September 25 Dr. Bird saw the plaintiff. He wrote that the plaintiff "is still wearing his cloth kneepads plus he had two other kneepads that wouldn't stay in place. The polyurethane ones really compressed too much in one spot. He tried using those in the shower. His knees do look a little better today." (Bird depo., Tab D, pages 53–55; Bird Medical Records, Depo. Lx. 17, Tab N.)

On September 29, the plaintiff received new kneepads. (Depo. ex. 2, Tab G, page A00084.) Sometime in September the jail provided the plaintiff with a shower chair. (Schmidt depo., Tab A, Vol.11, at pages 183–184.)

On October 3 the plaintiff submitted a Request for Medical Attention. He wrote:

"My knees hurt. They are getting tite [sic] when I try to straten [sic] my legs. And I need some kneepads that don't roll out from under my knees when I walk on them. And you were going to get me device so I don't have to crawl." (Depo. Lx. 4, Tab 1, page A00470.) Dr. Bird did not see the plaintiff on this occasion. (Bird depo., Tab D, pages 57–58.)

On October 6 the plaintiff had a disagreement with a guard. He refused to crawl to the food hole to dump his food tray. He "went off" on the guard, cursing and yelling, saying he wouldn't crawl anywhere to dump his tray. He told the guard that he wasn't going to do anything until he got something to get around on. The guard told the plaintiff that the plaintiff would be put someplace where he didn't have to worry about crawling very far, and the guards picked up the plaintiff and moved him to the detox tank. The guard called Sergeant Munley and "told him about Tracy's complaints about getting around." Sergeant Munley told the guard to move the plaintiff to "the tank." The guard said she already had, and Sergeant Munley said "good enough." More than 2 days later, the plaintiff was moved out of the tank at 2:00 AM to make room for other prisoners. (Depo. Lx. 2, Tab G, pages A0086–A0088; Munley depo., Tab B, pages 181–185.)

On October 13, the jail was inspected by Tom Keys of the Kansas Department of Corrections. Mr. Keys found a number of violations of the Kansas Advisory Jail Standards. (Keys depo., Tab L, pages 19–30; 1995 Inspection Report, Tab Q.) He

also spoke to the plaintiff in the jail. The plaintiff complained about having to crawl around the jail. Mr. Keys spoke to the head jailer about the problem, but was told that there was nothing that could be done. (Keys depo., Tab L, pages 31–35.) On October 16, the plaintiff's mother brought in new kneepads, and was paid for them by Sergeant Munley. (Depo. Lx. 2, Tab G, page A00091.)

On October 27 the plaintiff submitted a Request for Medical Attention. He wrote:

"I'm sick. And my knees are swollen and throbbing. I have way too much [fluid] in my stumps & a lot of discomfort. See me this time, ok! Monley [sic] said it's not them, its you not wanting to see me. All so [sic] having chest pains." (Depo. Lx. 4, Tab I, page A00471.) The head jailer probably saw this request. (Munley depo., Tab B, page 166.) Dr. Bird saw the plaintiff on October 30. The plaintiff reported intermittent problems with his knees and that sometimes they were swollen more than others. The plaintiff reported a shooting pain that goes down into his stump which is like nerve pain. The dermatitis on the plaintiff's buttocks was better. The doctor noted that the plaintiff now had a shower chair. He wrote that the "knees have no evidence of tissue breakdown. Actually the hypertrophy of the knees looks better than it has in a long time. There is a small amount of overall edema, but very minimal. No evidence of cellulitis or bursitis." He found some wheezing in the plaintiff's lungs, diagnosed bronchitis, and treated him for that. The doctor noted "chronic irritation of the knees." This was the last time Dr. Bird saw the plaintiff. (Bird depo., Tab D, pages 58–62; Bird Medical Records, Depo. Lx. 17, Tab N.)

On November 5, a guard noted that the plaintiff was "too lazy" to get off of his bunk to exchange his bedding. He did not get fresh bedding that day. (Depo. Ex. 4, Tab G, page A00096.) On November 7 the plaintiff submitted a Request for Medical Attention. He wrote that his knees and stumps hurt and were swollen. He com-

plained of a "popping" in his left knee all the time. He wrote, "This concrete is taking my knees down hard." (Depo. Lx. 4, Tab I, page A00472.) The head jailer remembers seeing this request. (Munley depo., Tab B, pages 166–167.) Jailers spoke to Dr. Bird about the plaintiff's request the same day. Dr. Bird said to the jailer, "What can I do for Schmidt -I can see him but unless he is provided with 'wheels' or moved to an area where he doesn't move around so much or so far— then nothing can be done." The jailer wrote that Dr. Bird was very concerned about a lawsuit before "we get Tracy out of here." The jailer noted "Feb. of 1996"—the date of the conclusion of the plaintiff's sentence. (Depo. Lx. 2, Tab G, page A00097; Bird depo., Tab D, pages 64–65); Head Jailer Munley reviewed these log entries on a daily basis and read this note. (Munley depo., Tab B, pages 93, 213–214.) Dr. Bird's records do not indicate that he saw the plaintiff pursuant to the November 7 request. (Depo. Ex. 17, Tab N.) On November 8 the plaintiff was provided with a new set of kneepads. (Depo. Lx. 4, Tab G, page A00098.)

On November 14 a new attorney representing the plaintiff wrote Sheriff Odell and demanded medical attention for the plaintiff. He also consented to the transfer of the plaintiff to an "A.D.A. conforming facility such as the Sedgwick County Detention Center." (Depo. Lx. 14, Tab M.)

On November 15 the plaintiff was transferred to the Sedgwick County Jail. (Odell Interr. Resp., Tab 0, No.2). He was brought to Wichita, again without a wheelchair, and forced to crawl. (Schmidt depo., Tab A, pages 212–213.)

On November 16 the plaintiff was examined at the Sedgwick County jail by Physician's Assistant Conrad Yumang. Mr. Yumang examined the plaintiff's knees and stumps. He found them to be erythematous and flubby, or red and inflamed. The skin of the knees was cracking and soft. He found open sores on the plaintiff's

knees, which he treated with antibacterial ointment. Mr. Yumang was surprised at the condition of the plaintiff's limbs and asked why they were in such poor condition. The plaintiff told him that he had been walking on his knees at the Winfield jail because he did not have a wheelchair. (Yumang Affidavit, Tab X.)

On February 28, 1996, after his release from jail, Dr. Brenda Taylor Schewe again examined the plaintiff. She found his knees in very poor condition, and in worse condition than in her previous examination. This was the first time she had seen him since the previous March. At the time of the examination both of the plaintiff's knees were erythematous, and there was crepitous and palpable effusion in the patellar region. Crepitous means that the knees made a grinding sound when moved. Palpable effusion means that there was swelling in the knees that she could feel. The plaintiff reported to Dr. Schewe both his experience crawling in the jail, and his fall on his stumps at Sabolich.[2]

The head jailer, Sergeant Munley, saw the plaintiff crawling around the jail during his confinement. It bothered Sgt. Munley to see the plaintiff crawling. To Munley, it looked miserable for the plaintiff. (Munley depo., Tab B, pages 171–173.) Munley believed the plaintiff when he said his knees hurt. (Munley depo., Tab B, page 162.) The plaintiff complained to him fairly often, probably a couple of times a week. (Munley depo., Tab B, pages 231–232.) Sgt. Munley feels that if the plaintiff had to walk around the jail on his knees, his complaint about that condition is justified. (Munley depo., Tab B, page 233.) Dr. Bird testified that being on his knees was more painful for someone with the plaintiff's medical history, and that walking on his knees probably made the plaintiff's knee pain worse. (Bird depo., Tab D, pages 62, 69.) The plaintiff complained to Dr. Bird that having to

crawl on his knees was disgraceful. (Bird depo., Tab D, page 80.) The plaintiff's knees are tender as a result of his incarceration at the Cowley County Jail, and he has a problem with them swelling. His knees still bother him with a dull pain. (Schmidt depo., Tab A, Vol.1, page 114.) Sheriff Odell is not sure whether he was aware that a physician had requested that the plaintiff have a wheelchair. However, if he did know, it would not have mattered. (Odell depo., Tab C, pages 122–123.)

The jail doctor and the jailers had proposed solutions to plaintiff's condition. They proposed that the plaintiff just stay on his bunk all of the time. (Although the head jailer conceded that this was not possible.) (Munley depo., Tab B, pages 152–54.) The jailers also proposed placing the plaintiff in the drunk tank also referred to in the record as "detox" or "the hole" for his confinement, which had a polyurethane floor. This is a small tank with no furniture, a toilet that can be only flushed from the outside one small window, and no opportunity to mingle with other prisoners or watch television. (Schmidt depo., Tab A, Vol.11, 245–246, 248; Munley depo., Tab B, pages 29–30, 225; Odell depo., Tab C, pages 124–125.) Sergeant Munley has no memory of anyone serving as much as a month in detox. (Munley depo. Tab B, page 189.) Detox is used to discipline inmates. (Hearing Transcript, Tab F, page 38.)

Another proposed solution was to move to block 11, where the two stacked bunks are next to the shower and toilet. (Munley deposition, page 225.) These cells are small and again are isolated from the population and without television. (Schmidt depo., Tab A, Vol.11, page 250; Odell depo., Tab C, pages 124–125.) Block 11 is not normally used for the long-term confinement of inmates. (Munley depo., Tab B, page 233; Odell depo., Tab C, pages

---

2. Plaintiff cites a portion of Dr. Schewe's affidavit for the proposition that "The problems with Mr. Schmidt's knees were consistent with overuse of the knees, as opposed to the fall on his stumps. (Schewe Affidavit, Tab

S.)." A statement that the plaintiff's condition was "consistent with" overuse is insufficient to establish causation within a reasonable degree of medical certainty, which is the standard for admissibility of medical opinion.

126–127.) The head jailer felt that the detox cell would have been better for the plaintiff than block 11. (Munley depo., Tab B, page 238.) The loss of television privileges and isolation from other prisoners are considered disciplinary measures. (Munley depo., Tab B, pages 240–241.)

The head jailer spoke to the Sedgwick County jail about transferring the plaintiff there, but does not know how many times. There are no records of these conversations. The Sheriff did not talk to the Sedgwick County Jail himself. Neither of them contacted any county jails other than Sedgwick County about taking the plaintiff although at least sixteen county jails in Kansas had wheelchair accessible facilities. (Munley depo., Tab B, pages 225–226; Odell depo., Tab C, page 62–63; Odell Interr. Resp., Tab 0, No.7.) Sheriff Odell understood that the Sedgwick County Jail was requiring that the plaintiff's lawyer would inspect the jail in Wichita and agree that it was capable of maintaining the plaintiff before the Wichita facility would accept him. This was the understanding between Odell and Sedgwick County. As far as Odell knows, the plaintiff's attorneys did not agree to this requirement. (Odell deposition, Tab C, pages 64–69; Hearing Transcript, Tab F, pages 40–41.)

The plaintiff felt that he was taunted and ridiculed during his stay at the Cowley County jail. One of the guards would ask the plaintiff what suit he was going to wear with his kneepads this week. This type of comment caused him emotional distress. He was told that he was being placed in the "hole" (detox) as his handicapped facilities. At one point he spent a week in detox, with no shower. In addition to not allowing him to shower in detox, there were occasions when he asked the jailers to flush his toilet (which had to be flushed from outside the cell) and was told they didn't have time or couldn't get to it right now. (Schmidt depo., Tab A, Vol.11, pages 237–239, 250–253, 256–258.) He had pus pockets on his stumps and they were swollen. (Schmidt deposition, page 240.) Sheriff Odell, in talking to the plaintiff about the condition, said that he "wasn't responsible for how I had to live but to see that I did my time and completed it." (Schmidt depo., Tab A, Vol.11, pages 240–241.)

## II. *Summary Judgment.*

The standards and procedures for summary judgment are well established and will not be fully repeated here. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In essence, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

## III. *Discussion.*

### A. *Eighth Amendment Claim.*

#### a. *Standards for Cruel and Unusual Punishment.*

■ The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., Amdt. 8. It is now settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *Id.* The duty imposed on state officials by the Eighth and Fourteenth Amendments was explained by the Supreme Court in *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 1005–1006, 103 L.Ed.2d 249 (1989):

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being.... The rationale for this principle is simple enough: when the

State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment...."

According to the Supreme Court, a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be "sufficiently serious." *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970 (*citing Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Generally, to violate the amendment a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities." *Id.* (*citing Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Second, the prison official must have a "sufficiently culpable state of mind," which, insofar as conditions of confinement are concerned, requires a showing that the official was "deliberately indifferent" to inmate health or safety. *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970. This second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Id.* (citing *Wilson*, 501 U.S. at 297, 111 S.Ct. 2321). The Supreme Court has characterized "deliberate indifference" as something more than an ordinary lack of due care and something less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result. *Farmer*, 511 U.S. at 835, 114 S.Ct. 1970. Under this standard, a prison official cannot be found liable for denying a prisoner humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.* at 837, 114 S.Ct. 1970.

b. *Conditions Generally.*

Plaintiff argues that numerous factors at the Cowley County Jail contributed to produce what amounted to cruel and unusual punishment. He first complains of the jail's general conditions. Among other things, plaintiff cites deficiencies such as plumbing problems, overcrowding, inadequate exercise areas, and other defects noted in the 1995 jail inspection. Although the record indicates that the Cowley County Jail is antiquated and in need of repair, plaintiff has not cited evidence sufficient to support a claim that the general conditions during his confinement rose to the level of cruel and unusual punishment. For example, although the exercise areas at the jail were relatively small, there was space available for recreation and exercise in the dayrooms outside the cells. Access to those rooms was not generally restricted; inmates could move between their cells and the dayrooms during the day. *Cf. Housley v. Dodson*, 41 F.3d 597, 599 (10th Cir.1994) (total denial of exercise for an extended period of time would violate Eighth Amendment). And although the jail apparently had no facilities for outdoor exercise, that fact alone is not sufficient to support a claim given the opportunity for exercise in the dayrooms. *See Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988) (no violation where inmate permitted only indoor exercise). With respect to alleged overcrowding, in *Rhodes v. Chapman*, 452 U.S. 337, 348, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the Supreme Court held that allegations of overcrowding must be tested by an examination of the effects of overcrowding on the totality of prison conditions, including among other factors the adequacy of food, sanitation, medical care, and the quality of the physical facility. In the instant case, plaintiff cites no evidence that overcrowding resulted in the denial of "the minimal civilized measure of life's necessities." *See Id.* at 347, 101 S.Ct. 2392. The same is true as to allegations of plumbing problems and other allegedly unsanitary conditions. No evidence has been cited that any such problems posed a serious threat to the health, safety, or well-

being of the plaintiff during his incarceration. Nor is there evidence that the defendants were deliberately indifferent to such matters. Moreover, the fact that this is a county jail where the plaintiff and other inmates served a relatively short period of incarceration weighs against a finding that the conditions in question constituted cruel and unusual punishment. *Cf. Hutto v. Finney*, 437 U.S. 678, 686, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (length of confinement is a factor in deciding whether confinement meets constitutional standards). In sum, conditions at the jail may have been far from ideal, but plaintiff has failed to cite evidence that they were unconstitutional.

### c. *Plaintiff's Medical Condition and Ability to Move.*

In addition to challenging these general conditions, plaintiff contends the defendants' failure to provide greater accommodation for his disability, with the consequence that he had to crawl on the floor to move about the jail, violated the Eighth Amendment. After considering all of the circumstances and evidence cited by plaintiff, the court concludes a reasonable jury could find that the defendants' conduct in this respect constituted the infliction of cruel and unusual punishment in violation of the Eighth Amendment.

■ At the outset the court rejects plaintiff's suggestion that the defendants' failure to provide him a wheelchair, standing alone, was unconstitutional. *See* Pl. Mem. at 49 ("To comply with the Eighth Amendment, ... mobility impaired inmates must be provided with wheelchairs...."). The evidence is uncontroverted that this particular jail could not accommodate wheelchairs. The exits, entrances and hallways were too narrow. Also, the defendants have cited legitimate security concerns about placing a wheelchair among the jail's general population. In light of these practical impediments, the defendants' refusal to provide a wheelchair in the jail cannot be said to violate the Eighth Amendment. *Cf. Wilson v. Seiter*, 501 U.S. at 302, 111 S.Ct. 2321 ("[W]hether

[conduct] can be described as 'wanton' depends upon the constraints facing the official."). *See also Crowder v. True*, 74 F.3d 812, 815 (7th Cir.1996) (allegation that jailers denied paraplegic a wheelchair because it did not fit through the cell doors was not sufficient to raise inference of deliberate indifference).

■ This finding, though, does not preclude plaintiff's claim. In *LaFaut v. Smith*, 834 F.2d 389 (4th Cir.1987), Justice Powell, writing for the Fourth Circuit, addressed the Eighth Amendment claim of a paraplegic inmate who alleged that his jailers' failure to provide appropriate toilet facilities and rehabilitation therapy constituted cruel and unusual punishment. The court agreed that the jailers' actions, including a failure to make minor accommodations in a timely manner, which caused the plaintiff great difficulty in using the toilet, fell short of meeting the "broad and idealistic concepts of dignity, civilized standards, humanity, and decency" embodied in the Eighth Amendment. *Id.* at 394 (*citing Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Although the court recognized that prison administrators must be given wide-ranging deference in operating prisons, it nevertheless concluded: "There is nothing in the record before us ... to justify the inordinate delays in accommodating appellant's needs in light of the practicality and availability of various solutions. Prison officials should not ignore the basic needs of a handicapped individual or postpone addressing those needs out of mere convenience or apathy." *Id.* at 394.

■ The court concludes that the ability of the plaintiff to move himself about the jail in an appropriate manner—to use the toilet, to use the shower, to obtain his meals, and to obtain suitable recreation and exercise—was a basic need—part of the "minimal civilized measure of life's necessities"—that the defendants were obligated to help provide under the Eighth Amendment. *Cf. Wilson*, 501 U.S. at 304, 111 S.Ct. 2321 (identifying exercise as a basic human need). As in *LaFaut*, the

record in this case could support a finding that the defendants failed to assist plaintiff with this basic need in a timely manner. After the plaintiff's prostheses became un-useable, the defendants initially made commendable efforts by seeing that plaintiff was regularly transported to the Sabolich clinic. But at some point it was made clear to them that plaintiff would be unable to obtain or use new prostheses until the condition of his knees and residual legs improved. Despite this knowledge, the defendants' only allowance was to provide plaintiff with kneepads, which, as their own physician observed, were not adequate, which clearly did little to relieve the pain plaintiff incurred from walking on his knees on concrete floors, and which did nothing to avoid the indignity of having to crawl or slide around on floors that the record indicates were in various degrees of uncleanliness. The defendants were informed by Sabolich technicians and Dr. Bird that plaintiff needed a wheelchair to relieve the pain and swelling he was experiencing and to enable him to be fitted for prostheses. In June, another physician prescribed a wheelchair for plaintiff after surgery for an infection. Because the jail could not accommodate a wheelchair, however, the defendants simply took the approach that plaintiff should not move off of his bunk, although they recognized this was not entirely possible because plaintiff still had to crawl around to use the toilet, to shower and to obtain meals. In doing so, the defendants appear to have disregarded medical advice concerning a serious need of the plaintiff. *See Johnson v. Hardin County, Ky.*, 908 F.2d 1280, 1283–84 (6th Cir.1990) (Eighth Amendment claim based in part on jailers' refusal to provide inmate crutches prescribed by doctor; jailers instead told plaintiff to stay off his feet as much as possible). This was an inadequate response in light of other reasonable accommodations the record suggests could have been made, and together with the other evidence it provides a basis upon which a jury could infer that the defendants were deliberately indifferent to plaintiff's basic needs.

One obvious accommodation would have been to transfer plaintiff to a jail equipped to handle wheelchairs. The record suggests the defendants' efforts to arrange such a transfer were meager at best. Nothing is cited to show what efforts, if any, were made prior to June of 1995, when a transfer was discussed at a court hearing instigated by plaintiff's counsel. Prior to the June hearing the defendants had apparently not informed plaintiff of the possibility of a transfer or how one might be arranged. And although someone from the Cowley County Jail contacted the Sedgwick County Jail at some point, the record is clouded as to what efforts the defendants actually made to bring about a transfer. Even after the June hearing, it was not until some fourth months later that plaintiff was finally transferred. The defendants hint that the problem lay with plaintiff's counsel, but the record does not merit summary judgment in defendants' favor on that account. The defendants had an obligation to see that plaintiff's basic needs were met, and they have not shown beyond dispute that they discharged this obligation. As plaintiff points out, even if there were some problem with arranging a transfer ·to the Sedgwick County Jail, it is undisputed there were at least sixteen county jails equipped for wheelchair access, yet the defendants made no effort to contact any of these other jails, and offer no justification for failing to do so.

There is also the matter of not providing plaintiff with a wheelchair when he was transported to and from the jail. According to plaintiff's evidence, wheelchairs were available at the jail and at the Sabolich clinic, but the jailers transporting him[3] refused to allow him to use them.

---

**3.** The record is unclear as to the named defendants' responsibility, if any, for the actions of the jailers transporting plaintiff. Neither party discusses whether the defendants were aware of and authorized such actions. *Cf. Farmer v. Brennan*, 511 U.S. 825, 838, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[a]n official's failure to alleviate a significant risk

As a result, he had to crawl into the jail parking lot and into the van, then crawl through the parking lot in Wichita at Sabolich, into the elevator, and up to his appointment. Plaintiff testified that the crawl through the parking lot was both painful and humiliating. Although the defendants have explained why they could not provide a wheelchair in the jail, they offer no justification for failing to permit the use of a wheelchair during these trips. *Cf. LaFaut*, 834 F.2d at 391 (Eighth Amendment prohibits infliction of pain that is totally without penological justification).

In addition, the defendants offer no explanation for not providing plaintiff a shower chair in a timely manner. Plaintiff requested a shower chair and gave the defendants a letter from a doctor in February of 1995 indicating his need for one. Yet for the next six or seven months, he had to take a shower by crawling upon the shower floor and by standing on his knees. *Cf. LaFaut*, 834 F.2d at 393 (criticizing three-month delay in making minor accommodations). The defendants were clearly aware of this situation. Under the circumstances, plaintiff had no choice but to sit on the shower floor, which he understandably found degrading, or to stand on his knees, which was clearly painful. He developed a rash on his buttocks which lasted for several months, apparently from contact with the shower floor or from crawling around. Under the circumstances, the delay in providing a shower chair appears to have resulted not only in the unnecessary infliction of pain, but also in a needless indignity that a jury could find was inconsistent with the Eighth Amendment.

The record shows that the defendants offered to accommodate plaintiff by housing him in either cell block 9 or 11. It is undisputed that being in either of these cell blocks would have significantly reduced plaintiff's need to ambulate. Despite this, the court concludes that such an offer is not sufficient to entitle the defendants to summary judgment. As an initial matter, although providing a cell with a shower and toilet nearby would have reduced plaintiff's need to move around, it would not have eliminated the problems, pain and indignity associated with walking on his knees and crawling on the floor. Moreover, such an accommodation would have effectively confined plaintiff to a small area with no opportunity to move about, without the privileges enjoyed by the other inmates, in a segregated area of the jail used for punishment of inmates— all on account of his disability. The court notes that the Americans with Disabilities Act prohibits prisons from discriminating against a qualified individual with a disability on account of that disability. *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998). Although ADA requirements are clearly not synonymous with or incorporated into the Eighth Amendment, the ADA reflects, to some degree, contemporary standards of decency concerning treatment of individuals with disabilities. Because the Eighth Amendment draws from the "evolving standards of decency that mark the progress of a maturing society," *Rhodes v. Chapman*, 452 U.S. at 346, 101 S.Ct. 2392, a reasonable jury could find that treatment of a disabled inmate such as that described here falls short of "the basic concept of human dignity at the core of" the Eighth Amendment. *See Gregg v. Georgia*, 428 U.S. 153, 182, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

 The defendants also argue they are entitled to summary judgment on the basis of qualified immunity. The court does not agree. The constitutional prohibition on deliberate indifference to an inmate's medical and other basic needs was clearly established at the time in question. Numerous courts had held prior to 1995 that a jailer's failure to provide a wheelchair, crutches or other assistance could consti-

that he should have perceived but did not, while no cause for commendation, cannot

under our cases be condemned as the infliction of punishment.")

tute cruel and unusual punishment under certain circumstances, particularly where such assistance was prescribed or requested by a doctor: *See e.g., Cummings v. Roberts,* 628 F.2d 1065 (8th Cir.1980) (denial of wheelchair for three days states a claim for cruel and unusual punishment); *LaFaut v. Smith,* 834 F.2d 389 (4th Cir. 1987) (failure to make accommodations for wheelchair-bound inmate violated Eighth Amendment); *Johnson v. Hardin County, Ky.,* 908 F.2d 1280, 1283–84 (6th Cir.1990) (jailers' refusal to provide inmate with crutches supported claim). The court concludes that the contours of the right were sufficiently clear that a reasonable official would understand that the type of conduct alleged here would violate the Eighth Amendment.

In sum, the record discloses a genuine issue of fact as to whether the defendants were deliberately indifferent to plaintiff's basic needs while he was imprisoned in the Cowley County Jail. Accordingly, defendants' motion for summary judgment is denied as to the Eighth Amendment claim.

B. *Intentional Infliction of Emotional Distress.*

 Defendants next seek summary judgment on plaintiff's claim for intentional infliction of emotional distress. They argue plaintiff has no evidence of the "extreme and outrageous conduct" necessary to support such a claim. As defendants point out, to prevail on this claim plaintiff must show: (1) the conduct of the defendants was intentional or in reckless disregard of the plaintiff; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress was extreme and severe. *Smith v. Welch,* 265 Kan. 868, 876, 967 P.2d 727, 733 (1998). To satisfy the second element, the conduct must be "so outrageous in character and so extreme in degree as to go beyond the bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society." *Id.* As the court indicated with respect to plaintiff's Eighth Amend-

ment claim, there is evidence from which a jury could find that the defendants were deliberately indifferent to plaintiff's basic needs and inflicted unnecessary pain and humiliation upon him while he was in their custody. Under the circumstances, the court concludes a reasonable jury could find such conduct sufficiently egregious to support a claim for the tort of outrage.

C. *ADA and Rehabilitation Act Claims.*

 Lastly, defendants seek summary judgment on plaintiff's ADA and Rehabilitation Act Claims. Defendants argue plaintiff is asserting nothing more than a challenge to the medical care he received and argue that he was not denied full access to the services, programs or activities of the jail. Def. Mem. at 29. They also contend they complied with the ADA because they "made every effort to make their facility readily accessible to the plaintiff." *Id.* at 31.

Title II of the ADA provides in part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12131(2). It is undisputed here that plaintiff was a qualified individual with a disability. In *Pennsylvania Dept. of Corrections v. Yeskey,* 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998), the Supreme Court held that state prisons were public entities covered by the Act.

 The court finds plaintiff has cited evidence that he was discriminated against or denied the benefits of some of the basic services of the jail by reason of his disability, including the use of the toilet, shower, recreational areas, and obtaining meals. Assuming "discrimination" under § 12132 includes a failure to make reasonable accommodation for a known disability, *cf.* 42 U.S.C. § 12112(b), the court concludes there is a genuine issue of fact as to whether the defendants failed to make

reasonable accommodation for plaintiff's disability, including by failing to timely transfer him to an appropriate facility and failing to timely provide a shower chair. *Cf. Love v. Westville Correctional Center,* 103 F.3d 558, 561 (7th Cir.1996). The fact that plaintiff was actually able to use most of the jail services does not preclude his claim in light of the fact he was able to do so only by virtue of exceptional and painful exertion which was contrary to a physician's instructions concerning his disability.

*Conclusion.*

Defendants' Motion for Summary Judgment (Doc. 82) is DENIED.